EQUITY MORTGAGE CORPORATION,
Plaintiff,

v.

Harold J. LOFTUS, Jr., and Jeanne M.
Loftus, Defendants,

v.

UNITED STATES of America,
Intervenor.

Civ. A. No. 431–69–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

Sept. 30, 1970.

———◆———

Robert M. White, Norfolk, Va., for Equity Mortgage Corp.

A. J. Kalfus and Joel B. Cooper, Norfolk, Va., for Harold and Jeanne Loftus.

Clarence J. Grogan, Tax Div., U. S. Dept. of Justice, Washington, D. C., for the United States.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

The issue for decision presented by both the Government's and Equity Mortgage's motions for summary judgment involves a question, apparently of first impression, under 28 U.S.C., section 2410 (d), as to what sum must be paid by the United States to Equity Mortgage Corporation for the purpose of the United States exercising its statutory right of redemption under 26 U.S.C., section 7425, and 28 U.S.C., section 2410.

The pertinent facts are not in dispute.

Mutual Federal Savings and Loan Association is the holder of a note or notes executed by Harold J. Loftus, Jr. and Leanne M. Loftus, secured by a first deed of trust on the Loftus residence. As of March 21, 1969, there was an outstanding principal balance of $17,956.33 due to Mutual Federal on this deed of trust note.

Equity Mortgage Corporation is the holder of a deed of trust note dated June 13, 1966, signed by the defendants, Mr. and Mrs. Loftus, and secured by a second deed of trust on the Loftus residence duly recorded on June 15, 1966. This note provided *inter alia:*

"Should default be made in the payment of any installment of this principal amount, then so much of said principal amount as remains unpaid, shall become due and payable at the option of the holder hereof.

"Negotiable and payable at the Virginia National Bank at its principal offices in the City of Norfolk, Virginia, or at such other place as the holder hereof may designate. The makers and endorsers hereof hereby waive the benefit of their homestead exemptions as to this debt, and do further waive demand, presentment, protest and notice of dishonor, and agree to pay all expenses incurred in collecting the same, including fifteen percent attorney's fee in case this note shall not be paid at maturity."

The second deed of trust was given to secure the note in accordance with the provisions of sections 55–59 and 55–60 of the Code of Virginia as then amended. It provided that the deed of trust was to be construed to impose and confer upon the parties the duties, rights, and obligations set forth in the above sections of the Code.

On June 15, 1967, a federal tax lien which arose by reason of assessments made against Mr. and Mrs. Loftus for 1961–1963 was filed with the Circuit Court of the City of Virginia Beach against the same property already subject to both the Mutual Federal and Equity Mortgage deeds of trust. This lien, in the sum of $17,221.79, was junior to both of the above deeds of trust.

Subsequently Mr. and Mrs. Loftus defaulted on the payments due under both deeds of trust. Equity Mortgage on July 15, 1968; January 13, 1969; Jan-

uary 30, 1969; and February 28, 1969, made payments aggregating $1,796.40 to Mutual Federal on the note secured by the first deed of trust.

After proper notice to the Commissioner, as required by the Internal Revenue Code of 1954, sections 7425(b) and (c) (1), Equity Mortgage instructed the trustee to foreclose on the second deed of trust. On March 21, 1969, the property was publicly offered for sale at auction and was purchased by Equity Mortgage, subject to the first deed of trust, for $1,-000. As of the date of this sale the principal balance outstanding on the second deed of trust note was $3,210.28. By an accounting report filed April 14, 1970, the trustee under the second deed of trust indicated that, after deducting expenses of the sale from the $1,000 bid price, $801.95 was credited to the noteholder. Representatives from the Internal Revenue Service were present at the sale but neither bid nor informed Equity Mortgage of any intention to redeem. Equity Mortgage recorded the deed of bargain and sale at a cost of $103.50. This recording cost was based on an estimated fair market value for the property of $32,500.

On March 26, 1969, an attorney for Equity Mortgage wrote to the Internal Revenue Service that the total amount owed to it by Mr. and Mrs. Loftus was $5,224.80, exclusive of trustee's commission. This balance was broken down as follows:

| | |
|---|---|
| Principal balance on second deed of trust ...................... | $3,210.28 |
| Payments made by Equity Mortgage Corporation to Mutual Federal Savings & Loan on account of the first mortgage (including interest) .... | 1,866.47 |
| Newspaper advertisement of foreclosure sale ................ | 98.05 |
| Commissioner of accounts ......... | 25.00 |
| Trustee's Deed .................. | 25.00 |
| Trustee's Commission ........... | Five percent |
| TOTAL (exclusive of Trustee's Commission) .................... | $5,224.80 |

Equity Mortgage indicated that it was willing to assign the property to the Internal Revenue Service for the above sum.[1]

On July 16, 1969, within the statutorily required 120 days from the date of the foreclosure sale, the United States tendered to Equity Mortgage a U. S. Treasury check payable to Equity Mortgage in the sum of $1,019.27 for the purpose of exercising its right of redemption under 26 U.S.C., section 7425(d), and 28 U.S.C., section 2410(d). This sum represented the $1,000 bid for the property by Equity Mortgage on March 21, 1969, plus interest at 6% from the date of sale to the date of the tender. Equity Mortgage refused to accept the Government's tender on the grounds that it was insufficient. On July 18, 1969, the District Director of Internal Revenue caused a certificate of redemption to be recorded in the Circuit Court of the City of Virginia Beach.

Between the date of the foreclosure sale and the date of the tender, Equity Mortgage made payments to Mutual Federal on the note secured by the first deed of trust of $563.80. Since the date of the tender and through June 1, 1970, Equity Mortgage has made further payments of $1,656.20 to Mutual Federal. As of June 1, 1970, the total payments by Equity Mortgage to Mutual Federal were $4,016.40.

Equity Mortgage, in August 1969, filed a bill of complaint in the Circuit Court of Virginia Beach against both the United States and Mr. and Mrs. Loftus, seeking to quiet the title and to recover costs, damages, attorney fees, and allowances against both defendants in this action. The United States removed the case to this court. It was then dismissed as a defendant, but allowed to file an amended complaint in intervention. In its complaint in intervention, the United States has asked this court to adjudge that the Government exercised its right

---

1. It is not clear in comparing this letter with the trustee's report of April 14, 1970, whether the sum of $3,210.28 listed as principal balance on second deed of trust

had already been credited with the net proceeds from the foreclosure sale. Apparently it had not been so credited.

of redemption under 26 U.S.C., section 7425(d) and 28 U.S.C., section 2410(d), thereby acquiring title and ownership of the property in question, subject only to the balance due and owing as of July 16, 1969, on the note of Mutual Federal, the holder of the first deed of trust. Based on the above facts, each side has now moved for summary judgment.

In support of its position the Government cites 28 U.S.C., section 2410, as amended by the Federal Tax Lien Act of 1966. This section, together with 26 U.S.C., section 7425, allows the United States, when it has a tax lien extinguished by the foreclosure of a lien senior to its own, to redeem such property by making a tender to the purchaser as set forth in 28 U.S.C. 2410(d) below:

"(d) In any case in which the United States redeems real property under this section or section 7425 of the Internal Revenue Code of 1954, the amount to be paid for such property shall be the sum of—

(1) the actual amount paid by the purchaser at such sale (which, in the case of a purchaser who is the holder of the lien being foreclosed, shall include the amount of the obligation secured by such lien to the extent satisfied by reason of such sale),

(2) interest on the amount paid (as determined under paragraph (1)) at 6 percent per annum from the date of such sale, and

(3) the amount (if any) equal to to the excess of (A) the expenses necessarily incurred in connection with such property, over (B) the income from such property plus (to the extent such property is used by the purchaser) a reasonable rental value of such property."

It is the position of the Government that, under Watkins v. Dupuy, 87 Va. 87, 12 S.E. 294 (1890), Equity Mortgage, after the foreclosure, had the right to sue Mr. and Mrs. Loftus for the deficiency still owed on the note. According to the Government, since Equity Mort-gage still had the right to sue for a deficiency judgment on the unpaid balance of their original note, then the Government only need tender $1,000 actually bid by Equity Mortgage at the foreclosure sale, plus interest. At a hearing on the motions for summary judgment, attorneys for Equity Mortgage offered to waive any right to a deficiency judgment against Mr. and Mrs. Loftus if the Government would pay Equity Mortgage the full amount owed to it by the Loftuses on their note. The Government, however, has held to the position that its original tender was sufficient.

The Government interprets 28 U.S.C. § 2410(d) (1) to say that when, after a foreclosure sale, the purchaser whose lien is being foreclosed still has the right to sue the grantor for the unpaid balance of the amount due him, then the Government need not tender more than the amount paid at the foreclosure sale, even if the grantor is "judgment-proof" and even if the purchaser is either willing to waive all rights against the grantor for any deficiency because of such a lien or to assign such rights to the Government. Apparently it is the Government's position that the lienholder who purchases the subject property at the foreclosure sale must either bid the full amount owed to him by the grantor or, prior to the foreclosure sale, waive any right to a deficiency judgment against the grantor in order to be entitled to full compensation when and if the Government elects to redeem under section 2410.

The Government further contends that under the Code of Virginia, section 55–59(2), (5) and (13), the expenses incurred in the foreclosure sale were incurred by the grantor rather than Equity Mortgage. Since these expenses became liabilities of Mr. and Mrs. Loftus to Equity Mortgage, it is the Government's view that they merely augmented the deficiency due Equity Mortgage and were not properly included in the sum required to be tendered by the Government. In support of its position, the Government cites Senate Report No.

1708, 89th Cong.2d Sess. 34 (1966), U.S.Code Cong. & Admin.News, p. 3722.

The Government also contends that it need not include in its tender any payments by Equity Mortgage to Mutual Federal, the holder of the first deed of trust, made either prior to the foreclosure or those made in the interim between the foreclosure and the date of tender. Here, likewise, it is the Government's position that these payments merely compounded what was owed by Mr. and Mrs. Loftus to Equity Mortgage. In disputing any right of subrogation, which Equity Mortgage might have because of these payments, the Government contends that Virginia law bars the right of Equity Mortgage to use subrogation to compete with the claim of a prior encumbrancer. Presumably the Government feels that, under the redemption statute, it should be accorded a new status prior to Equity Mortgage. Finally, with regard to these payments, it is the Government's view that 28 U.S.C. § 2410(d) (3) contemplates only genuine maintenance expenses and not payments to a holder of a first deed of trust. In support of this final point, the Government cites Senate Report No. 1708, 89 Cong. 2d Sess. 34–35 (1966).

The results sought by the Government give the Government a windfall at the expense of the plaintiff, Equity Mortgage. At the time of the foreclosure, the property was worth approximately $32,500; the balance due Mutual Federal on the first deed of trust note was $17,956.33; the balance due Equity Mortgage on the second deed of trust note was $3,210.28; the Government's tax lien was for $17,221.79. Under these circumstances, if the Government purchased the property for $1.00 above what was owed to the prior lienholders and then resold it for $32,500, it could collect roughly $10,000 on its lien. If, however, the Government were to redeem the property for the $1,000 tender subject only to the first deed of trust, it would be able—by reselling the property at a price based on a market value of $32,500, less the balance on the first deed of trust—to realize roughly $13,500 on its lien. This $13,500 windfall for the Government would arise solely at the expense of Equity Mortgage which originally had lien status prior to that of the Government, but after redemption could only collect on a deficiency judgment from a "judgment-proof" debtor. However, the Government's windfall does not end here. Following the foreclosure, Equity Mortgage made payments to Mutual Federal on the first deed of trust note in order to prevent foreclosure of its equity interest. If the Government's position is well taken, Equity Mortgage would not have to be compensated for these payments; yet, since the first deed of trust has been paid down and concomitantly the equity interest increased, the Government, upon resale, would profit from the increased equity position. Even if the taxpayer benefits from a decrease in his taxes due, this benefit is no justification for, in effect, making Equity Mortgage pay on account of the Loftus tax lien.

Furthermore, these results would force upon Equity Mortgage the "Hobson's Choice" of either waiving any right to a deficiency judgment against the grantor, regardless of whether the Government ever seeks to redeem, or forfeiting the balance due on its original note, the costs of recording its deed, and all payments made on the first deed of trust in order to prevent foreclosure of the newly acquired equity position.

Such results are clearly inequitable and so we must now turn to a careful examination of 28 U.S.C. § 2410(d) and its legislative history to see if these results were intended by Congress.

28 U.S.C. § 2410(d) specifies the amount that the Government must pay when it redeems real property following foreclosure by a prior lienholder. This provision was first enacted as part of the Federal Tax Lien Act of 1966. The Government's right of redemption, however, dates back to H.R. 980, 71st Cong. 3 Sess. (1931). It is with the legislative history of this prior provision that we begin.

In the 70th Congress, 1st Sess. (1928), a bill, H.R. 13981, providing that the United States could be made a party defendant in foreclosure suits was introduced in the House in response to the demands of lending institutions which were unable to quiet title to foreclosed property as long as the United States had an outstanding tax lien. The bill contained no provision for the Government to bid for property sold at foreclosure sales or subsequently to redeem such property. It was referred to the Committee on the Judiciary, reported back to the House without amendment H.Rep.No.2029, 70th Cong.2d Sess. (1929), and passed by the House as reported, 70 Cong.Rec. 2006 (1929).

The Senate added a section which would have allowed a stay of such sales until Congress could appropriate funds for the Government to bid at a foreclosure sale. S.Rep.No.1830, 70th Cong. 2d Sess. (1929). This section provided as follows:

"That upon the application of the Attorney General, the court in which any such suit may be pending may, for good cause, stay the sale of the property involved under any decree that may be entered in such suit, until the expiration of the next succeeding session of Congress."

As amended the bill passed the Senate, 70th Cong.Rec. 3714 (1929).

The House conferees disagreed with the above section of the Senate bill thinking it "to impose an unusual and unnecessary delay upon the foreclosure and sale under the bill." H.R.Conf.Rep. 2744, 70th Cong. 2d Sess. (1929). The Senate acceded to the House and the bill was passed without the above-quoted section. However, there was a pocket veto by the President and the bill did not become law.

In the first session of the 71st Congress, Congressman Graham introduced a similar bill, H.R. 980, to permit the United States to be made a party defendant for the removal of liens or claims of the United States on real estate. 71 Cong.Rec. 1st (1929). This bill, as with respect to its predecessor, was referred to the Committee on the Judiciary which reported the bill favorably stating that the purpose of he bill was—

"to provide a simple and just method of proceeding in * * * [cases where mortgagees who need to foreclose on a piece of property find they cannot because of the existence of a federal tax lien filed subsequent to their own 'for which the mortgagee owes no obligation either legal or moral'], [a method] which is fair to the holder of the prior lien on the real estate and which amply and fully protects the rights of the Federal Government." H.R.Rep.No.95, 71st Cong. 1st Sess. (1929).

After recommittal for review by the Department of the Treasury, the bill was brought to the floor of the House.

In subsequent debates, 72 Cong.Rec. 3120–3121 (1930), Congressman Bloom asked how the Government could protect itself if it had a subordinate lien and a prior lienholder bid less than the property was worth (or less than his lien) in order to get the property at a discount price. He noted that the Government would need an appropriation in order to bid. Congressman Graham answered that the Government ought not to bid in order to protect its interest. Congressman Hawley answered that the Government had no right to bid.

H.R. 980 passed the House and was sent to the Senate were it was amended to be virtually the same bill that had passed the Senate the year before. S. Rep.No.351, 71st Cong. 2d Sess. (1930). Following passage by the Senate, both houses refused to yield on their respective versions. The two bills were sent to a joint conference committee which made revisions to allow the Government a right of redemption for one year after sale. H.R.Conf.Rep.No.2722, 71 Cong. 3rd Sess. (1931).

The pertinent portions of this report are set forth below:

"The Senate amendment contains a clause allowing the court to stay pro-

ceedings or sale until the expiration of the next session of Congress. This was no doubt intended to allow Congress to appropriate money to enable the United States, if a junior lienholder, to bid enough at the sale to take care of prior liens and thus protect its own. In place of that the substitute bill provides that if a junior lienholder, the United States shall have a year in which to redeem. That does away with the necessity for a delay of sale. In many states * * * there are now laws allowing junior lienholders as well as fee owners a year in which to redeem from execution and foreclosure sale of real estate. It is true that in other states no such equity of redemption exists. However, the provision adds nothing to the present difficulties in states which allow no redemption period, as under present conditions where the present lienholders cannot sue the United States, the rights of the United States never are barred by foreclosure sale."

Both legislative branches agreed to this compromise and H.R. 980 was subsequently signed into law by the President.

From a careful review of the legislative history of H.R. 980 we conclude that there is nothing to indicate that Congress, in passing H.R. 980, ever intended anything but the equitable use of the Government's power of redemption. We now consider the current legislation after mention of two cases decided in the interim between passage of the original right of redemption and the 1966 modifications, and involving what the Government must pay upon redemption.

In First National Bank and Trust Company v. MacGarvie, 41 N.J.Super. 151, 124 A.2d 345 (1956), modified and affirmed, 22 N.J. 539, 126 A.2d 880 (1956), the court held that one who repurchases must pay the full amount due the foreclosing mortgagee even if the Government was the one redeeming. In a court of equity the Government must do equity as well. At p. 348 of 124 A.2d the court concluded:

"I don't think Congress meant any such inequitable and unconscionable thing as to allow the Government, at any time up to a year after the sale, to come in, offer what was paid at the foreclosure sale, and immediately assume the position of senior lienholder, pushing every one else into the background and thus, by wiping out the foreclosure bid, gain an advantage which it could never get at the foreclosure sale, or before it, by redeeming without *paying the amount of the mortgage*, the interest, the fees, and everything else that might be due to the senior lienor."

In United States v. Brosnan, 264 F.2d 762 (3rd Cir., 1959), aff'd on other grounds, 363 U.S. 237, 80 S.Ct. 1108, 4 L.Ed.2d 1192 (1960), the court held that a tender by the Government of the amount bid at the foreclosure sale was insufficient and that the mortgage must be paid in full.

The Federal Tax Lien Act of 1966, H.R. 11256, 89th Cong. 2d Sess. (1966), was the first comprehensive revision and modernization of the tax lien laws. It was introduced in the House and referred to the Committee on Ways and Means along with an identical bill, H.R. 11290.

In Hearings on H.R. 11256 and H.R. 11290 before the House Committee on Ways and Means, 89th Cong., 2d Sess. 103 (1966), [hereinafter *Hearings*], Mr. Surrey, Assistant Secretary of the Treasury, stated that the new subsection 2410(d), prescribing the amount that the United States was to pay in order to redeem property from a purchaser at a foreclosure sale, provided a formula of uniform application in all jurisdictions, rather than being based on the law of each different state. Mr. Williams, Chairman of the Special Committee on Federal Liens of the American Bar Association, speaking in support of the bill, stated that under the then existing law the federal tax lien was not truly confined to property and rights to property belonging to a delinquent taxpayer. Such a lien then often en-

croached on property or rights to property belonging to third parties "by preempting—taking priority over—in effect, confiscating the interest of other parties in the taxpayer's property." *Hearings* at p. 61. Mr. Williams was specifically referring to what was known as the "choateness doctrine" by which otherwise valid prior liens could be subordinated to a subsequently assessed federal tax lien. It is interesting to note, however, that the same complaints made by Mr. Williams against the choateness doctrine could be leveled against the Government under the facts of this case. The 1966 Act made significant changes to the choateness doctrine. In none of the testimony in the *Hearings* or any of the committee reports is there any indication that subsection 2410(d) was intended, or even anticipated, to create any new such inequity.

House Report 11256, 89th Cong., 2d Sess. 10 (1966) points out that—

"The bill also provides a priority over filed tax liens for interest with respect to, and certain other costs of preserving property underlying, a lien or security interest which is superior to a Federal tax lien. For this priority to exist, however, local law must also provide this interest or expense the same priority as the lien or security interest to which it relates. The types of items referred to here are—

(1) Interest or carrying charges (including finance and service charges) on the obligation secured by a lien or security interest;

(2) Reasonable expenses of an indenture trustee (such as a trustee under a deed of trust) or agent holding a security interest;

(3) Reasonable expenses incurred in collecting and enforcing a secured obligation (including reasonable attorney's fees);

(4) Reasonable costs of insuring, preserving, or repairing the property subject to the lien or security interest;

(5) Reasonable costs of insuring payment of the obligation secured (such as mortgage insurance); and

(6) Amounts paid by the holder of a lien or security interest to satisfy another lien on the property where this other lien has priority over the Federal tax lien.

These interest charges and expenses arise out of a lien or security interest having priority over the Federal tax lien, and your committee believes that, although they are not fully determinable as of the time notice of the Federal tax lien is filed, nevertheless, they should be given priority since they relate to a lien or security interest having such a priority."

While the giving of priority for these payments does not necessarily mean the Government should have to tender an amount to include these same payments if and when. it redeems, and while 2410 (d) does not specifically list such payments as interest and carrying charges on prior mortgages, it would be ironic if Congress gave a lienholder priority in one section of the bill only to take away the benefits of this priority when the Government redeems. There is no indication of any such intent on behalf of Congress.

In discussing redemption, the House report says at p. 27 only:

"(4) *Redemption by the United States (Sec. 7425(d) of the code)* As previously indicated, under the bill the Government is given the authority to redeem real property sold under other than plenary judicial proceedings where the sales were to satisfy a lien prior to a tax lien. The period of time for redemption in these cases is 120 days from the date of sale or the period allowable under local law, if longer. Where the Government exercises its right of redemption, it must pay the amount paid by the purchaser at the sale plus interest and expenses necessary to maintain the property from the time of sale. Procedures are set forth to be followed in prepar-

ing certificates of redemption for this purpose."

And in discussing the creation of a redemption fund the Report at p. 30 notes that on resale of redeemed property the Government may be able to make a profit which would be credited to the taxpayer's account. There is no indication, either here or in the restatement of the redemption payment formula at p. 33, of any Congressional intent for the Government to make a profit at the expense of the prior lienholders. The technical explanation of the legislation by the committee is also silent on this point.

In the floor debates, Congressman Trimble described H.R. 11256 as substantially improving the status of private secured creditors. With respect to the redemption provisions he stated, 113 Cong.Rec. 21293 (Daily Ed. September 12, 1966):

"In addition to dealing with the relative priority of creditors' interests as against Federal tax liens, the bill also makes numerous modifications in the provisions of the internal revenue laws dealing with the procedures to be followed in collecting the taxes of a delinquent person. In general terms, these modifications are intended to represent a reasonable accommodation of the interests of the Government in collecting the taxes of delinquent taxpayers with the rights of the taxpayers and third parties. The modifications are concerned with the procedures of levying upon property of a delinquent taxpayer, the liability of lenders, sureties, and so forth, for *withholding* taxes, the running of the statute of limitations in the case of delinquent tax liabilities, procedures arising out of, or with respect to the sale of property of delinquent taxpayers, the court procedures to be followed with respect to tax liens, and provision for the redemption of real property by the United States, where sold by a creditor with a higher priority."

Congressman Martin took the same position, stating at 21294 that "The bill also is intended to reach a reasonable accommodation between the interests of the Federal Government in collecting delinquent taxes and the rights of taxpayers and third parties whose interests are affected." Congressman Mills, Chairman of the House Ways and Means Committee, noted at 21308 that "experience under the tax lien procedure has indicated other instances where the present rules work inequities, both in and out of the commercial area." He stated at 21310, "The major provisions in this bill are designed to protect creditor's rights. Other provisions are designed to improve collection procedures both from the standpoint of the Government and from the standpoint of the taxpayers."

Congressman Byrnes, the ranking Republican member of the House Ways and Means Committee, stated at 21311:

"The intent of these amendments as they relate to the priority of Federal liens is to promote equity and facilitate commerce by making the legal rules governing tax liens more certain and fair.

"In addition to the changes relating to the priority of the Federal tax lien, the bill makes many other changes in the rules governing the seizure of property for the collection of tax, the release of liens, and other matters generally related to the collection by the Government of delinquent tax liabilities. The changes are intended to make collection procedures more equitable and more convenient to taxpayers, the Government, and the general public."

The only discussion with respect to the Senate's consideration of the price to be paid by the Government in redeeming was in Senate Report No. 1708, 89th Cong., 2d Sess. 34 (1966), as set forth in full below:

"The bill also provides a formula for determining the price the Government must pay where it redeems property sold in proceedings where the Government is joined as a party (under this section), and where it is sold in

foreclosures other than plenary judicial proceedings. The redemption price is to be the amount paid by the purchaser at the foreclosure sale plus interest at the statutory rate (6 percent) from the date of sale. Where the purchaser at the sale is the person whose lien is being foreclosed, the amount paid by him includes the amount of the debt underlying his lien to the extent that the lien is satisfied by the sale. Where the lien is fully satisfied, the purchaser is not to receive less than the amount due him at the time of sale. Where the lien attaches to other property, however, or where, after the sale, the purchaser still has the right to sue for the unpaid balance of the amount due him, the amount paid does not include this unpaid balance.

"In addition to the price paid by the purchaser plus interest, in order to redeem property, the Government must pay, as part of the redemption price, the excess, if there is any, of any expenses incurred after the foreclosure sale in maintaining the property over the income from the property during this period. Where the property is not rented out but is used by the purchaser, the income includes the reasonable rental value of the property."

It is significant that the legislative history of H.R. 11256, as set forth above, indicates an affirmative intent on the part of Congress to provide an equitable balance between the Government and the taxpayer. No member of Congress indicated a contrary intent. It is also significant that there is no indication in the legislative history of any intent to change the law as to what the Government must do upon redemption as set forth in First National Bank and Trust Company v. MacGarvie, supra, and United States v. Brosnan, supra.

W. T. Plumb, Jr., Chairman of the ABA Committee on Federal Tax Liens and Collection Proceedings and author of Federal Liens and Priorities Agenda for The Next Decade, 77 Yale L.J. 1104, (1968), thinks that the new price formula may force mortgagees to bid at the market value or the amount of their lien even though "Low bidding would ordinarily reduce commissions and conveyance taxes, and would avoid artificially creating taxable interest income or profit in what is essentially a salvage operation." He continues at p. 1177 that "Now, mortgagees and other senior lienors (including those making nonjudicial sales, which were not affected before) must review and perhaps revise their bidding practices in the light of the new threat. The existence of even a worthless right to a deficiency judgment (for which the mortgagee may choose not to apply) may now entitle the Government to obtain without fully satisfying the senior debt, the property which represents the mortgagee's only hope of recouping his investment, at least if he does not in some legally effective manner release his right to a deficiency before the sale" In support of this view he cites Temp.Treas.Reg. § 400.5–1(c)(2), examples (2), (3), (T.D. 6944, filed 1–19–68), 1968 Int.Rev.Bull. No. 8 at 41, which indicated to him that the Government might take such a position.[2]

Mr. Plumb went on, however, at p. 1178 to criticize what he feared Congress had done:

"It may be questioned whether the new redemption price rule serves any legitimate federal interest. The Government's financial interest is fully protected if it is permitted to acquire whatever value the property may have above the amount owing on senior liens; if there is no such excess value, the Government is not hurt by the underbidding. State redemption laws entitling junior lienors to take over the benefit of the senior lienor's bargain (even when they are not injured) were designed to operate as, and can be justified only as, an added threat to force the senior lienor to bid higher and thus minimize the debt-

---

**2.** Mr. Plumb's prediction of the Government's position is borne out by this case.

or's deficiency obligation—a problem which other states have chosen to meet, if at all, in their own different ways. Conceivably, if any states have been laggard in protecting debtors against underbidding, there may be a national interest in generalizing this form of protection; but, if so, the matter should be presented to Congress on that basis, and not as a casual incident of federal lien legislation.

"While the Government perhaps should enjoy the same advantage that other junior lienors would have in those states with redemption laws, Congress should consider requiring, in *other* circumstances, that the redemption price cover the full amount owing to senior lienors, so that redemption will be availed of only to provide a surplus for the United States where the value of the property exceeds senior liens, and not to obtain a windfall for the Government.[a]  (Of course, if

[a] "The windfall may be further enhanced by the extinguishment, without right of redemption under state law, of liens which were junior to the one foreclosed but senior to the federal lien. At least if the federal lien is a tax lien, the windfall ultimately benefits the debtor through credit on his liability."

the Government *does* redeem for such full amount, the senior lienor's right to a deficiency, whether or not reduced to judgment, should be either discharged or passed to the Government by subrogation.) [b]  If that suggestion

[b] "Full discharge might be justified on the theory that the Government, in redeeming, is not speculating in claims but is signifying its belief that the property has a real value at least equal to the redemption price, of which the debtor should have the benefit. However, that belief may be in error. Since the

is not acceptable, Congress should at least provide that the full amount of the indebtedness shall be included in the redemption price whenever the senior lienor, within a prescribed period after the sale, effectively relinquishes his right to a deficiency judgment or allows it to expire unexercised."

debtor will get credit for any profit the Government makes on resale, at least if its interest was a tax lien, see note 412 infra, subrogation to the deficiency claim, assuming it has been duly preserved, may be justified as indemnifying the Government against loss on resale."

We do not share the learned author's pessimism. We note that he did not review the specific legislative history on this point. Our review of this history convinces us that Congress intended to do what he thinks they should have done.

The crux of the Government's interpretation of section 2410(d) is based on the statement in Sen.Rep. 1708, supra, at p. 34—

"Where the lien is fully satisfied, the purchaser is not to receive less than the amount due him at the time of sale. Where the lien attaches to other property, however, or where, after the sale, the purchaser still has the right to sue for the unpaid balance of the amount due him, the amount—[to be paid by the Government in redeeming the property purchased at foreclosure sale] does not include this unpaid balance [still due the purchaser from the person whose property is foreclosed.]"

■ Because of the importance placed on this statement by the Government, it requires close examination. In light of the legislative history cited *supra,* we think a fair reading of this statement, together with subsection 2410(d), indicates a Congressional intent to prevent those who purchased property at the foreclosure sale of their own lien from making a profit at the expense of the taxpayer, and thus possibly at the expense of the Government as one of taxpayer's creditors. By preventing a purchaser from making a profit on resale of underbid foreclosed property and then also collecting from the grantor for a deficiency, section 2410(d) protects the Government's interest even if the Government does not bid at the foreclosure sale. However, there is no reasonable indication that Congress intended to go further and force the lienholder either to renounce any right to a deficiency be-

fore any foreclosure sale without knowing even if the Government intends to redeem or to forfeit any balance still owed to him.

The precise language of section 2410 (d) (1), does not preclude the obligation of the grantors to the lienholders, Equity Mortgage, being "satisfied" in full by Equity Mortgage's filing a waiver to any further recourse against the grantors at any reasonable point in time. In a state where no deficiency judgments are allowed, even the Internal Revenue Service agrees that the Government must pay the full amount of the grantor's obligation to the lienholder in order to redeem. Temp.Treas.Reg. § 400.5–1(c) (2) example 1 (T.D. 6944, filed 1–19–68), quoted in 5 PH Federal Taxes, para. 38830. When the lienholder waives any right to a deficiency from the grantor then it is in the same position as if the state law prohibited such judgments. As discussed above, neither the literal wording of the statute nor the legislative history indicates that the lienholder should not be allowed to elect such a waiver, if and when the Government elects to proceed with its right of redemption.

There, we hold that where, as in the case at bar, the lienholder has agreed to assign any rights against the grantors to the Government, or to waive any right to a deficiency judgment against the grantors, then whether the lienholder takes such action before or after the foreclosure sale, the Government, in order to redeem the property purchased by this lienholder, must pay the lienholder the amount paid by the purchaser at the sale (with interest), plus the full balance still owing under the second deed of trust. Furthermore, because the lienholder should not have to make an unconditional anticipatory renunciation of his potential rights against the grantors, we hold that Equity Mortgage may condition its renunciation on the Government's election to redeem with full payment as set forth in this opinion.

Turning to the question of the payments by Equity Mortgage to Mutual Federal, we hold that although section 2410(d) makes no explicit provision for reimbursement for these payments, the same interpretation of Congressional intent should apply to prevent a forfeiture. We also note that according to Plumb, supra at note 408, the administrative practice, at least in the Internal Revenue Service, is to allow credit for such payments. Furthermore, under the traditional equitable principles of either an equitable lien or subrogation, the lienholder should be protected as far as payments to prevent foreclosure of a prior mortgage are concerned. See Sutherland, Statutory Construction (Horack, ed.) § 6001–6007 (1943).

Keel v. Vinyard, 48 Idaho 49, 279 P. 420 (1929) provides some support for the creation of an equitable lien in favor of Equity Mortgage for the payments to Mutual Federal. There the plaintiff, the holder of a third deed of trust, acquired property at a foreclosure sale subject to a right of redemption in the grantor. In order to preserve his interest in the property, plaintiff was compelled to pay the past due installments on the prior mortgages or face foreclosure by the prior deeds of trust holders. The state redemption statutes in computing the amount necessary to redeem did not contemplate the inclusion of payments of the sort made by plaintiff on the prior mortgages. The state statutes provided for the inclusion of assessments and taxes paid by the purchaser, but the court found that these payments were not in these categories. Therefore, the court concluded that any relief to the plaintiff would have to be based on principles of equity and not on the redemption statute. By analogy to the situation where a cotenant who redeems property originally held by several tenants in common then has an equitable lien upon the interests of his cotenants, the court gave the plaintiff an equitable lien.

Equity Mortgage would also be entitled to be paid by the Government for all payments made by Equity Mortgage to Mutual Federal under the equitable doctrine of subrogation. Subroga-

tion is a creature of equity, founded upon principles of natural justice, and Virginia is committed to a liberal application of the principle. Federal Land Bank of Baltimore v. Joynes, 179 Va. 394, 18 S.E.2d 917 (1942).

■ Under this doctrine a junior mortgagee, who for the protection of his own security pays an installment due on the first mortgage, has been, to the extent of such advancement, subrogated to the rights of the holder of the first mortgage as against other parties junior to the first mortgagee. 83 C.J.S. Subrogation § 36 (1953). 50 Am.Jur.Subrogation, § 103 (1944). Thompson v. Miller, 195 Va. 513, 79 S.E.2d 643 (1954).

Obici v. Furcron, 160 Va. 351, 168 S.E. 340 (1933), cited by the Government, is not to the contrary. There the junior creditor paid part of the sums due each of several noteholders thereby preventing these creditors from exercising a legal right, granted to them by the debtor, to foreclose the deed of trust immediately. The junior creditor paid only part of what was due the senior creditors and then asked the court to be placed on a parity with these senior creditors. The court rightly refused stating that under these circumstances it would be neither equitable nor just for the junior creditor to be placed in this position. In our case the junior creditor does not seek priority over the senior lienholder. Rather, Equity Mortgage only seeks to be subordinated to the rights of Mutual Federal as against the Government to the extent that Equity Mortgage has paid what was due and owing under the Mutual Federal deed of trust. The rationale of the *Obici* case—the protection of the senior creditors—is not present in our situation. See Thompson v. Miller, *supra*. Here it is both equitable and just that Equity Mortgage should be compensated by the Government.

■ Finally we must resolve the question of whether in order to redeem the Government must also pay for the costs of recording the Equity Mortgage deed to it.[3] We need not decide whether such recording costs might be a legitimate maintenance expense because the costs under Code of Virginia, section 55-59 (14), were chargeable to the grantors and thus they properly become part of the deficiency owed to Equity Mortgage by Mr. and Mrs. Loftus. As part of the debt owed to Equity Mortgage, these costs must be paid provided Equity Mortgage waives the right to any deficiency from Mr. and Mrs. Loftus.

We do not reach the constitutional question which may appropriately be considered if the Government's position is correct. Arriving at our conclusion as to what we deem to be the intent of Congress, the constitutional issue of taking property, or an interest in property, without due process of law, is avoided.

Since payments by Equity Mortgage to Mutual Federal may have been made since July 16, 1969, which was the date of tender, although we are not advised with respect to same, the amount required to be paid by the Government to Equity Mortgage is left open. We note that, as of June 1, 1970, the principal balance due Mutual Federal has been reduced to $17,424.19. Obviously some party in interest has been paying Mutual Federal. To what extent, if any, this would alter the final amount due to Equity Mortgage, we express no opinion. Nor do we know whether the Government has the legal right to revoke its Certificate of Redemption which was recorded on July 18, 1969.

We do not adjudicate the rights of the Government and Mr. and Mrs. Loftus, *inter sese*, in this opinion. As the issues considered on the motions for summary judgment filed by Equity Mortgage and the United States of America may have

3. The costs of the foreclosure sale totaling approximately $200 should not be considered as a separate item because they have already been accounted for in computing what is still owed to Equity Mortgage after crediting the net proceeds from the foreclosure sale.

some bearing on the final outcome of any controversy between the Government and Loftus, both the United States of America and Equity Mortgage Corporation are granted a certificate to appeal from any interlocutory order to be entered upon presentation of an appropriate order.