EQUITY MORTGAGE CORPORATION,
a Virginia corporation, Appellee,

v.

Harold J. LOFTUS, Jr. and Jeanne M.
Loftus, Defendants,

United States of America,
Appellant.

No. 74–1003.

United States Court of Appeals,
Fourth Circuit.

Argued May 9, 1974.

Decided Oct. 18, 1974.

Gary R. Allen, Atty., Tax Div., U. S. Dept. of Justice (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Crombie J. D. Garrett, Attys., Tax Div., U. S. Dept. of Justice, Brian P. Gettings, U. S. Atty., and James A. Oast, Jr., Asst. U. S. Atty., on brief) for appellant.

Robert M. White, Norfolk, Va. (White & Selkin, Norfolk, Va., on brief) for appellee.

Before BOREMAN, Senior Circuit Judge, WINTER and CRAVEN, Circuit Judges.

WINTER, Circuit Judge:

When Equity Mortgage Corporation (Equity) foreclosed its second deed of trust on property owned by Mr. and Mrs. Harold Loftus in Virginia Beach, Virginia, it purchased the property for $1,000, subject to a first deed of trust to Mutual Federal Savings and Loan Association (Mutual) on which the principal balance was $17,956.33. At the time, the principal balance on the second deed of trust was $3,210.28. Additionally, before foreclosure, Equity had made payments to Mutual of $1,796.40 on account of the debt in order to avoid a foreclosure by Mutual and extinguishment of Equity's second lien.

Equity's foreclosure extinguished a federal tax lien for unpaid income taxes which was junior to Equity's second deed of trust. Within the time prescribed by statute, the government purported to exercise its right of redemption under 28 U.S.C. § 2410(d) and 26 U.S.C. § 7425 (d), and tendered Equity $1,019.27—Equity's purchase price at the foreclosure sale, plus statutory interest—but Equity declined the tender.

In this suit to quiet title, the district court, construing 28 U.S.C. § 2410(d) (1), held that the government could have redeemed only by paying Equity the full amount of its lien. We disagree. We hold that under the statute the government may redeem by paying Equity the amount the latter paid at foreclosure together with the expenses necessarily incurred in connection with such property which we hold included payments to Mutual prior to Equity's foreclosure as well as after foreclosure and prior to redemption. Additionally, on general principles of equity, we hold that the government must pay Equity subsequent amounts it paid to Mutual while this litigation was pending. Finally, we reject Equity's claim that the statute fixing the redemption price is unconstitutional. We reverse and remand for further proceedings in accordance with the views set forth herein.

I.

The facts are not disputed, and we adopt the statement set forth in the government's brief:

At all pertinent times prior to March 21, 1969, taxpayers, Harold and Jeanne Loftus, were the owners of certain real property located in Virginia Beach, Virginia. The property was subject to a first deed of trust securing a note executed by taxpayers in favor of Mutual Federal Savings and Loan Association (Mutual), and a second deed of trust (duly recorded on June 15, 1966) securing a note executed by taxpayers in favor of Equity.

On June 15, 1967, notice of a federal tax lien arising under assessments made against taxpayers for federal income taxes for the years 1961 through

1963 in the amount of $17,221.79 was filed in the Circuit Court of the City of Virginia Beach, Virginia. The government's tax lien was junior to both the first deed of trust securing the note held by Mutual and the second deed of trust securing the note held by Equity.

Thereafter, taxpayers defaulted on payments due on both of these notes, and Equity made payments to Mutual on the note secured by the first deed of trust in the total amount of $1,-796.40 during the period July 15, 1968, to February 28, 1969. Equity thereupon instructed its trustee to foreclose on the second deed of trust. After proper notice was given to the Commissioner of Internal Revenue, pursuant to Section 7425 of the Internal Revenue Code of 1954, the property was offered for sale at public auction on March 21, 1969, at which time Equity purchased the property, subject to the first deed of trust, for the sum of $1,000. As of that date, there was a principal balance outstanding on Mutual's note, secured by the first deed of trust, of $17,956.33, and a principal balance outstanding on Equity's note, secured by the second deed of trust, of $3,-210.28. The effect of the foreclosure sale under Virginia law was to discharge the property from the Government's junior tax lien and to satisfy taxpayers' obligation on the note held by Equity only to the extent of the purchase price less expenses of sale (i. e., $1,000 less $198.05 = $801.-95).

On March 26, 1969, Equity offered to assign the property to the Government for the amount then owed Equity by taxpayers of $5,224.80 (including the principal balance outstanding on the note, Equity's payments to Mutual and certain foreclosure expenses) plus a five-percent "Trustee's commission." The offer was not accepted. Instead, on July 16, 1969, within the 120-day period allowed for the exercise of the Government's right of redemption under Section 7425 of the Internal Reve-

nue Code and 28 U.S.C. § 2410, the Government tendered Equity a check in the amount of $1,019.27 (reflecting Equity's purchase price plus statutory interest as provided for under 28 U. S.C. § 2410(d)) for the purpose of exercising its right of redemption. Although Equity declined to accept the tender, the District Director of Internal Revenue caused a certificate of redemption to be recorded in the Circuit Court of the City of Virginia Beach on July 18, 1969. On April 15, 1970, Equity recorded its deed at a cost of $103.50 based on an estimated fair market value for the property of $32,500. Between the date of the foreclosure sale and the date of the tender, Equity made additional payments to Mutual on the note secured by the first deed of trust in the total amount of $563.80, and between the date of tender and June 1, 1970, Equity made further payments on Mutual's note in the amount of $1,656.20.

The District Court invalidated the certificate of redemption on the grounds that the Government's tender was insufficient in light of the payments made by Equity to Mutual, its expenses of recording its deed, and the principal balance remaining outstanding on its note. Notwithstanding the fact that taxpayer's obligation to Equity was satisfied by the foreclosure sale only to the extent of the net proceeds thereof, the court concluded that the provisions of 28 U.S.C. § 2410(d)(1) required the tender of the full amount of the obligation secured by the lien where, as here, the purchaser (Equity) has stated its willingness (after this action was commenced) to waive its right to a deficiency judgment if the full amount were tendered. (Record references omitted.)

## II.

The government's right of redemption, which is not contested, was created by 26 U.S.C. § 7425(d). Section 7425(b) governs a sale of property on which the United States has or claims a lien, and

§ 7425(d) states that "[i]n the case of a sale of real property to which subsection (b) applies to satisfy a lien prior to that of the United States, the Secretary . . . may redeem within the period of 120 days from the date of sale . . . ." The section states that the redemption price shall be the amount prescribed in 28 U.S.C. § 2410(d). The pertinent part of § 2410(d) reads:

(d) In any case in which the United States redeems real property under section 7425 of the Internal Revenue Code of 1954, the amount to be paid for such property shall be the sum of—

(1) the actual amount paid by the purchaser at such sale (which, in the case of a purchaser who is the holder of the lien being foreclosed, shall include the amount of the obligation secured by such lien to the extent satisfied by reason of such sale),

(2) interest on the amount paid (as determined under paragraph (1) ) at 6 percent per annum from the date of such sale, and

(3) the amount (if any) equal to the excess of (A) the expenses necessarily incurred in connection with such property, over (B) the income from such property plus (to the extent such property is used by the purchaser) a reasonable rental value of such property.

The part of the language of § 2410(d) which gives rise to this litigation is that in subparagraph (1)—"the actual amount paid by the purchaser . . . which [since Equity was the lienor and purchaser] shall include the amount of the obligation . . . *to the extent satisfied by reason of such sale . . .*" (emphasis added). The language is troublesome because one is required to look to state law to determine the effect of the lienor's purchase of the property at foreclosure on the overall obligation, and the laws of the various states differ. It is not disputed that, under the applicable Virginia law,

Equity's lien was satisfied only to the extent of the purchase price ($1,000), less the expenses of sale ($198.05), and that Equity would be entitled to a deficiency judgment against Mr. and Mrs. Loftus for the remaining unpaid balance. But this is not necessarily true in other states and, hence, § 2410(d)(1) may have a different effect in them in prescribing what the government must pay if it exercises its right to redeem.

That there are these differences in state law and that therefore § 2410(d) (1) prescribes a shifting quantum of redemption price depending upon the state in which it is applied are fully recognized in the examples to 26 C.F.R. § 400.5–1(c)(2), the temporary regulations to the Federal Tax Lien Act of 1966, and, specifically, to subparagraph (1)(i), which is a restatement of § 2410 (d)(1). They follow:

*Example* (1). A, a delinquent taxpayer, owns Blackacre located in X State upon which B holds a mortgage. After the mortgage is properly recorded, a notice of tax lien is filed which is applicable to Blackacre. Subsequently, A defaults on the mortgage and B forecloses on the mortgage which has an outstanding obligation in the amount of $100,000. At the foreclosure sale, B bids $50,000 and obtains title to Blackacre as a result of the sale. At the time of the foreclosure sale, Blackacre has a fair market value of $75,000. *Under the laws of X State, the mortgage obligation is fully satisfied as a result of the foreclosure sale and the mortgagee cannot obtain a deficiency judgment.* Under subparagraph (1)(i) of this paragraph, the district director must pay $100,000 in order to redeem Blackacre.

*Example* (2). Assume the same facts as in example (1), except that *under the laws of X State, the fair market value of the property foreclosed is the amount of the obligation legally satisfied as a result of the foreclosure sale, and in a case in which the amount of the obligation exceeds the*

*amount of the fair market value of the property, the mortgagee has the right to a judgment for the deficiency computed as the difference between the obligation and the fair market value of the property.* In such a case the district director must, under subparagraph (1)(i) of this paragraph, pay $75,000 in order to redeem Blackacre, whether or not B seeks a judgment for the deficiency.

*Example* (3). Assume the same facts as in example (1), except that *under the laws of X State, the amount bid is the amount of the obligation legally satisfied as a result of the foreclosure sale, and in the case in which the amount of the obligation exceeds the amount bid, the mortgagee has the right to a judgment for the deficiency computed as the difference between the amount of the obligation and the amount bid.* In such a case, the district director must, under subparagraph (1)(i) of this paragraph, pay $50,000 in order to redeem Blackacre, whether or not B seeks a judgment for the deficiency. (Emphasis added.)

■ It will be seen that Virginia is a state within the third example and the redemption price, before adjustments required by other provisions of law, is the amount bid at foreclosure irrespective of whether Equity has obtained a deficiency judgment for the balance of its unpaid debt.

Notwithstanding the contrary views of the district court, Equity Mortgage Corporation v. Loftus, 323 F.Supp. 144 (E.D. Va.1970), we think that the legislative history of § 2410(d) indicates that the statute means literally what it says. The definitive statement of purpose and intent is contained in S.Rept.No.1708, 89th Cong., 2d Sess., at 34 (1966):

The bill also provides a formula for determining the price the Government must pay where it redeems property sold in proceedings where the Government is joined as a party (under this section), and where it is sold in foreclosures other than plenary judicial proceedings. The redemption price is to be the amount paid by the purchaser at the foreclosure sale plus interest at the statutory rate (6 percent) from the date of sale. Where the purchaser at the sale is the person whose lien is being foreclosed, the amount paid by him includes the amount of the debt underlying his lien to the extent that the lien is satisfied by the sale. Where the lien is fully satisfied, the purchaser is not to receive less than the amount due him at the time of the sale. Where the lien attaches to other property, however, or where, after the sale, the purchaser still has the right to sue for the unpaid balance of the amount due him, the amount paid does not include this unpaid balance. S. Rept.No.1708, 89th Cong., 2d Sess.; 1966 [3] U.S.Code Cong. & Admin. News, at 3756.

We think the expression of legislative intent clear, concise and specific. Certainly it was intended to change the case law of such authorities as First National Bank & Trust Co. v. MacGarvie, 22 N.J. 539, 126 A.2d 880 (1956), affirming 41 N.J.Super. 151, 124 A.2d 345 (1956) and United States v. Brosnan, 264 F. 2d 762 (3 Cir. 1956), aff'd, 363 U.S. 237, 80 S.Ct. 1108, 4 L.Ed.2d 1192 (1960); and it was intended as a uniform federal rule to fix the computation of redemption price where federal statutes were theretofore silent. We do not think that literal application can be avoided on the ground of legislative overkill (323 F.Supp. at 154), or the subsequent unilateral act of the lienor after a title dispute and litigation have ensued (323 F.Supp. at 155). We hold that § 2410(d)(1) required the government to tender Equity only the amount paid by Equity at the foreclosure sale in order for the government to exercise its right of redemption. By the terms of § 2410 (d)(2), this amount bore interest at 6% per annum from the date of sale.

### III.

■ As previously stated, Equity made payments to Mutual prior to the

Equity foreclosure in order to forestall foreclosure by Mutual. Equity has made additional payments to Mutual since foreclosure, again to prevent Mutual from foreclosing its superior lien with the possibility of extinguishing Equity's interest, and one of these was made after foreclosure and prior to redemption. We think that Equity should be reimbursed for payments both before and after foreclosure, less any adjustments required to be made by § 2410(d)(3).

■ Section 2410(d)(3) requires, as an element of the tender price to effect redemption, the payment of "the expenses necessarily incurred in connection with such property." Of course, in the ordinary case, we think that the statute refers to expenses incurred by the purchaser at foreclosure during the 120-day period after foreclosure before the government exercises its option to redeem for ordinary maintenance of the property, i. e., painting, roof repairs, plumbing repairs, etc. But if the statute covers ordinary physical maintenance to prevent physical destruction of the property, in whole or in part, we disagree with the government that it should not also be read to include expenses to prevent destruction of the title. Thus, as we read the statute, it includes the single payment to Mutual within this period. But we do not think it unreasonable to read the statute to include more under the facts of this case.

■ It is certain that if Equity had not paid Mutual the installments on Mutual's debt which became due and were in default prior to Equity's foreclosure, Mutual may well have foreclosed with the possibility that the liens of Equity and the government might have been extinguished. In a very real sense, the payments to Mutual were, to a junior lien holder such as Equity, who buys in at its own foreclosure sale, expenses "necessarily incurred in connection with such property." They were essential to the continued viability of Equity's junior lien, and they had the effect of giving continued life to other liens junior to it. It is true that, as set forth in S.Rept.

No.1708, the legislative intent of § 2410 (d) was to permit the purchaser at foreclosure to recover "any expenses incurred *after* the foreclosure sale in maintaining the property." 1966 [3] U.S.Code Cong. & Admin.News, at 3756. (Emphasis added.) In the case of a third party purchaser or a purchase by a foreclosing senior lienor, "after the foreclosure sale" obviously means after title has been obtained. But in the case of a purchase by a foreclosing junior lienor, the principle against unjust enrichment requires that the statute be given a broader reading where the junior lienor has been required to make payments, prior to acquiring title, necessary to preserve its lien. Preservation of the junior lien has, as a necessary consequence, the preservation of the government's ability, through exercise of its right of redemption, to acquire the interest that the junior lienor acquires when he purchases the property at his own foreclosure. The injustice of allowing the government to retain this benefit without compensating Equity is apparent when one considers that Equity, had it been successful in obtaining Mutual's forbearance from pressing for collection until after Equity obtained title, could have brought such payments within the literal scope of § 2410(d)(3).

Accordingly, we think that the amount tendered by the government in exercise of its right of redemption should have included Equity's payments of the installments on Mutual's debt which became due and were in default prior to Equity's obtaining title by foreclosure, but without interest, since the statute allows interest only on the actual amount paid by Equity at the sale.

■ Although we hold that the $1,-866.47 paid to Mutual prior to the foreclosure sale and the $563.80 paid to Mutual after such sale and prior to the government's attempted redemption should be taken into account in computing the amount includable in the redemption price under § 2410(d)(3), it does not follow that Equity is entitled to a decree quieting title in it. First, § 2410(d)

(3) also provides that expenses incurred by the purchaser are to be offset by any income derived from the property by the purchaser during its holding period. Since the district court has made no findings concerning the amount of income, if any, that Equity derived from the property during the period between the foreclosure sale and the government's attempted redemption, a remand is necessary in order to determine what the correct redemption price should have been.

More importantly, even if the district court ultimately finds that the price tendered by the government was inadequate due to its failure to include the amounts specified above, we do not think that the district court should thereupon quiet title in Equity. The government made its original tender under the good faith belief that the statute did not require it to reimburse Equity for amounts paid to Mutual. Under such circumstances the government should be given a reasonable period of time after the district court's decision upon remand to perfect its original tender, notwithstanding the fact that the statutory period in which a full tender must be made has long since passed. First National Bank & Trust Co. v. MacGarvie, 22 N.J. 539, 547–48, 126 A.2d 880, 885 (1956); Bain v. U. S., 74–1 USTC ¶ 9114 (E.D. Tex. Sept. 25, 1973). Should the government perfect its tender, it will acquire title to the property in issue subject to certain equitable claims of Equity discussed below.

 Similarly, we think that the government should reimburse Equity for amounts paid by Equity to Mutual while this litigation has been pending, even though strictly speaking they are not covered by the statute, since the government purported to exercise its right of redemption, albeit imperfectly, before these payments were made. Reimbursement must be without interest because of the familiar rule that the government is not liable for interest except by statute or contract. U. S. v. N. Y. Rayon Importing Co., 329 U.S. 654, 67 S.Ct. 601, 108 Ct.Cl. 763, 91 L.Ed. 577 (1957). The precise question decided in this appeal is a novel one. Although we decide against Equity, we do not deem its contentions frivolous. While the litigation has been pending, it has been certain that Mutual must be paid by someone, or else it would foreclose its superior lien and wipe out whatever interests Equity and the government might have. If, during the period, Equity had not contested the government's title and, for reasons of its own, the government had not sold its interest in the property, the government would have been required to keep the debt to Mutual current or it might have lost its title to the property. Accordingly, we think that principles of fairness and equity, and the strong policy to avoid unjust enrichment, require that the government reimburse Equity for the amounts it paid to Mutual after the government purportedly exercised its right of redemption, if it acquires title to the property by perfecting its tender in conformity with the district court's decision upon remand. Ordinarily, a court of equity will impose an equitable lien upon the interest acquired by a person redeeming from a foreclosing junior lienor in the amount of payments made by such junior lienor to prevent foreclosure of a senior lien in order to prevent unjust enrichment. Graham v. Alcoves, 148 Colo. 379, 366 P.2d 375 (1961). This principle is applicable to the United States and it applies in the circumstances of this case. However, it will not be necessary to encumber the title that the government acquires when it perfects its original tender. The interests of Equity will be fully protected if the district court simply orders that Equity recover of the United States the amounts that it paid Mutual after the purported redemption by the United States, less, of course, any income that Equity derived from the property during such period, if, and when, the district court finally decrees that title vests in the United States as the result of perfection of its tender. The doctrine of sovereign im-

munity does not foreclose such an action by the district court. The United States, as intervenor, brought an affirmative claim in this action to quiet its title in the land. Equity's claim for amounts paid to Mutual during this litigation, less any corresponding income derived from the property, is in the nature of a set-off against the government's claim to the property. Such set-offs against an affirmative claim brought by the government have traditionally been considered exceptions to the sovereign's immunity to suit. U. S. v. Ringgold, 33 U.S. 150, 8 Pet. 150, 163, 8 L.Ed. 889 (1834).

### IV.

Before us, Equity contends that § 2410(d)(1) is unconstitutional because it denies procedural due process of law. In essence, the claim is that in accordance with Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), Equity should have been afforded a hearing before the government was permitted to exercise its right of redemption.

We reject the contention. We are unable to fathom what would be the subject matter of the hearing that Equity desires. The statute fixing the amount of money the government must tender to effect a redemption is self-explanatory and self-executing. To the extent that it requires interpretation as, for example, in the instant case, the courts are open and available, in a suit to remove a cloud on title, to pass on the adequacy of the tender. In case of any real dispute, Equity, or another lienor similarly situated, is not deprived of procedural due process of law.

Nor do we see any denial of substantive due process. Of course § 2410(d)(1) modifies state law, in cases in which the United States has an interest, as to what a lienor acquires when he purchases real property at his own foreclosure by giving the United States the right to redeem when its junior tax lien has been extinguished. In Virginia, the foreclosing-purchasing lienor is charged with knowledge that under the federal statute he risks being left with the right to become a judgment creditor of the debtor as his sole recourse on the secured obligation unless he bids the price at foreclosure up to the amount of the secured obligation. But since this option is available to avoid what may seem to the foreclosing lienor to be an unacceptable result, we cannot see where he has been deprived of property without due process of law.

For the reasons set forth above, the decision of the district court is reversed and the case is remanded for further proceedings in accordance with this opinion.

Reversed and remanded.