**MWT PROPERTIES, a Utah LLC, Plaintiff,**

v.

**Mark W. EVERSON, Commissioner, U.S. Internal Revenue Service, Defendant.**

No. 1:03–CV–00134 PGC.

United States District Court, D. Utah, Northern Division.

Sept. 24, 2004.

Antonio J. Velez, Salt Lake City, UT, for Plaintiff.

Jeanette F. Swent, Salt Lake City, UT, Rickey Watson, Washington, DC, for Defendant.

## MEMORANDUM OPINION GRANTING PARTIAL SUMMARY JUDGMENT FOR DEFENDANT EVERSON AND PARTIAL SUMMARY JUDGMENT FOR PLAINTIFF MWT

CASSELL, District Judge.

This matter is before the court on the parties' cross-motions for summary judgment. Partial summary judgment is hereby GRANTED in favor of defendant Everson ("IRS") with respect to the effectiveness of the IRS redemption. For this reason, it is ordered that the IRS be accorded quiet title to the property in question. However, the court also finds that the IRS must compensate MWT for its claimed legal expenses (incurred during the redemption period) relating to eviction of the unauthorized tenant. Accordingly, partial summary judgment is hereby GRANTED to plaintiff MWT with respect to compensation for claimed legal expenses.

### BACKGROUND

For the purpose of resolving the parties' cross-motions for summary judgment, the court finds the following facts to be undisputed. MWT Properties, a Utah LLC, purchased property at the Weber County Tax Sale on June 5, 2003, for $21,000. The property at issue is located at 346 30th Street, Ogden, Utah. At the time MWT purchased the property, valid and current federal tax liens had attached to the property. Notice of these tax liens was properly filed with the County Recorder of Weber County on June 19, 2002.

On August 18, 2003, the Internal Revenue Service (IRS) sent MWT notice, by certified mail, that it was considering exercising its right to redeem the property pursuant to 26 U.S.C. § 7425(d)(2). The notice informed MWT that it could apply for a release of the right of redemption if MWT paid an amount equal to the value of that right, approximately $38,000. MWT received the notice on August 19, 2003. Under § 7425(d), the IRS had 120 days from the date of the sale to effectuate the redemption. Pursuant to 28 U.S.C. § 2410(d), the amount to be paid for such redemption was the sum of (1) the purchase price paid by MWT, (2) interest on the purchase price from the date of sale to the date of redemption, and (3) certain excess expenses incurred by MWT during the period between the purchase and the redemption.

On September 15, 2003, MWT faxed to the IRS a written itemized statement of its expenses related to the property. The statement included "excess expenses" allegedly incurred in connection with MWT's purchase of the property, for which MWT sought reimbursement if the IRS redeemed the property. On September 16, 2003, the sole and managing partner of MWT called the Revenue Officer assigned to this action, Desica C. Willard, to discuss the statement. During this telephone conversation, Ms. Willard informed MWT that supporting documentation would have to be submitted before any of the claimed excess expenses could be paid. Based on this conversation, the IRS did not issue a written request for an accounting of MWT's excess expenses.

On September 19, 2003, MWT submitted an offer to purchase the redemption right

from the IRS. The IRS determined that MWT's offer was significantly less than the amount expected to be received through redemption and sale of the property. Accordingly, the IRS made the decision to proceed with the redemption of the property.

On September 23, 2003, the IRS delivered a check to MWT for $21,414.25—an amount reflecting the purchase price paid by MWT, plus six percent interest for over 120 days. The sole and managing partner of MWT accepted delivery of the check. On or about September 25, 2003, MWT submitted supporting documents for many of its claimed excess expenses to the IRS.

The IRS filed a redemption certificate with the Weber County Recorder's Office on October 1, 2003. The 120-day period for redemption by the IRS ended on October 3, 2003. No final action on MWT's request for excess expenses was taken before October 3, 2003. On October 17, 2003, MWT initiated this lawsuit against the IRS, alleging that the redemption was ineffective because the IRS failed to compensate MWT for its claimed excess expenses before expiration of the 120-day redemption period.

On or about May 11, 2004, the IRS issued a check to MWT for expenses incurred in acquiring a title report and insuring the property. The IRS disallowed MWT's claimed expenses for the rental value of the property, reproduction and postage charges, and legal fees related to eviction proceedings.

## STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall be rendered ... if the plead-

ings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [1] In applying this standard, the court must examine the evidence and reasonable inferences therefrom in the light most favorable to the non-moving party.[2] Because this case involves cross-motions for summary judgment, the court must " 'construe all inferences in favor of the party against whom the motion under consideration is made.' " [3]

## ANALYSIS

## I. Effectiveness of the Government's Redemption

Based on the pleadings, depositions, affidavits, and admissions that have been filed in this case, the court finds that there is no genuine issue as to any material fact. Thus, the sole issue the court must decide is which of the cross-moving parties is entitled to judgment as a matter of law. This issue turns on whether the IRS effectively redeemed the property within the required period of 120 days from the date of MWT's purchase, where (1) the IRS paid MWT the actual amount MWT paid for the property, plus interest on that amount, before the 120-day period expired, *but* (2) the IRS failed to compensate MWT for its claimed excess expenses until after the 120-day period expired.

Title 26 U.S.C. § 7425(b)(1) provides that where real property is subject to a non-judicial sale to satisfy a lien prior to a tax lien of the United States, such sale is made without disturbing the government's

1. Fed.R.Civ.P. 56(c).

2. *See Gaylor v. Does,* 105 F.3d 572, 574 (10th Cir.1997).

3. *Pirkheim v. First Unum Life Ins.,* 229 F.3d 1008, 1010 (10th Cir.2000) (quoting *Andersen v. Chrysler Corp.,* 99 F.3d 846, 856 (7th Cir. 1996)).

tax lien. Subsection 7425(d)(1) gives the government a right to redeem such property within 120 days from the date of sale. Under the authority of this subsection, 28 U.S.C. § 2410(d) requires the government to pay the sum of the following amounts when it exercises its right to redeem property:

> (1) the actual amount paid by the purchaser [for the property];
>
> (2) interest on the amount paid ... at 6 percent per annum from the date of [the] sale [to the date of redemption]; and
>
> (3) the amount (if any) equal to the excess of (A) the expenses necessarily incurred in connection with such property, [by the purchaser] over (B) the income from such property.... [4]

Title 26 C.F.R. § 301.7425–4(b)(3)(ii) provides that where there is a disagreement as to the amount properly payable for excess expenses, under subsection 301.7425–4(b)(1)(iii), "the purchaser ... may submit a written itemized statement to the district director within 30 days *after* the date of redemption." [5] This subsection does not indicate a final date before which the government must compensate the purchaser for such excess expenses.

Where the government exercises its right of redemption, it must, "without delay," file a certificate of redemption. [6] Such a certificate of redemption "shall constitute prima facie evidence of the regularity of the redemption." [7] However, "[i]f a certificate of redemption has been erroneously prepared and filed because the redemption was not effective, the [government] shall issue a document revoking such certificate of redemption and such document shall be conclusively binding upon the United States against a purchaser of the property...." [8] The recording of a certificate of redemption is not itself the moment of redemption; rather, such recording " 'serves merely to evidence that redemption occurred and to transfer legal title of the redeemed interest.' " [9] Courts applying 26 U.S.C. § 7425(d) have consistently held that "[r]edemption is completed by tender of a check to the purchaser for the purchase price." [10] Thus, the question in this case is whether the IRS effectively redeemed the property when it tendered a check to MWT within the 120–day period that failed to include compensation for excess expenses requested by MWT, a required part of the "purchase price."

MWT asserts that the IRS failed to effectively redeem the property within the required 120–day period because the tendered check did not include excess expenses claimed by MWT. MWT reasons that the statute setting forth the price to be paid by the government is stated in the conjunctive, and accordingly gives no weight to one part over another. Thus, MWT argues that payment of claimed excess expenses is just as essential for redemption to be effective as payment of the purchase price or interest. According to

---

**4.** *See also* 26 C.F.R. § 301.7425–4(b)(1).

**5.** (Emphasis added).

**6.** 26 C.F.R. § 301.7425–4(c)(2).

**7.** *Id.* at § 301.7425–4(c)(3).

**8.** *Id.*

**9.** *Vardanega v. I.R.S.*, 170 F.3d 1184, 1187 (9th Cir.1999), *cert. denied*, 528 U.S. 872, 120 S.Ct. 174, 145 L.Ed.2d 147 (1999) (quoting

*Southwest Products Co. v. U.S. Through I.R.S.*, 882 F.2d 113, 118 (4th Cir.1989)).

**10.** *Id.; see also Southwest Products Co.*, 882 F.2d at 117 (concluding that redemption under § 7425 is complete when the government tenders a check to the purchaser; the government thereafter only has to file a certificate of redemption in order to evidence the transaction and record title to the property).

MWT, because the IRS failed to include compensation for MWT's claimed excess expenses in the check tendered within the 120–day period, the redemption was ineffective and quiet title to the property should be granted to MWT.

The IRS responds that the redemption was effective because the check tendered by the IRS within the redemption period compensated MWT for its full purchase price plus interest. The IRS asserts that neither the statutes in question nor their legislative histories specifically require the government to pay claimed excess expenses within the 120–day redemption period. To the contrary, the IRS argues that 26 C.F.R. § 301.7425–4(b)(3)(ii) contemplates that redemption can be accomplished without payment of excess expenses within the 120–day period. As noted above, that provision provides that where there is a dispute as to the amount of the excess expenses that are properly payable, the purchaser has 30 days *after* the "date of redemption" to *submit* an itemized statement of those expenses. The regulation does not establish any date by which such a request must be acted upon by the government. Thus, according to the IRS, the governing regulation clearly recognizes that excess expenses may be both requested and paid beyond the 120–day redemption period. Accordingly, an otherwise effective redemption is not rendered invalid simply because the government failed to compensate the purchaser for such excess expenses until after the 120–day redemption period expired. The court agrees.

As the parties generally concede, this precise question of law has received little attention by the courts. Although there are a few non-controlling decisions dealing with the government's right of redemption that provide some guidance, none are directly on point. Thus, this appears to be a question of first impression for this court.

Turning first to the language of the statutes, both 28 U.S.C. § 2410(d) and 26 C.F.R. § 301.7425–4(b)(1) state the amount to be paid by the government to redeem real property under 26 U.S.C. § 7425 in the conjunctive. Where the government exercises its right to redeem property, it must pay the sum of (1) the actual amount paid for the property, (2) interest on the amount paid, and (3) excess expenses necessarily incurred to maintain the property.[11] Taken separately from the other parts of the statute, this language would strongly suggest, as MWT argues, that the government must compensate the purchaser for all three elements before redemption is complete. Under this interpretation, the IRS merely *attempted* to redeem the property by tendering a check to MWT within the 120–day redemption period; however, because the check failed to include the required excess expenses element, such redemption was ineffective.

However, this isolated reading of § 2410(d) and § 301.7425–4(b)(1) appears to be in direct conflict with § 301.7425–4(b)(3)(ii), which allows the purchaser to claim excess expenses within 30 days *"after* the date of redemption,"[12] at least where there is a *dispute* as to the amount properly payable for such expenses *or* where there were *additional* expenses that were not claimed in the original statement. The plain language of § 301.7425–4(b)(3)(ii) clearly indicates that the date of redemption can occur even before the purchaser's excess expenses are fully compensated. Because the plain language of the governing statutes addressing precisely the same problem seem to directly conflict, the court finds it necessary to consider

---

**11.** 28 U.S.C. § 2410(d); 26 C.F.R. § 301.7425–4(b).

**12.** (Emphasis added).

other means of statutory construction in order to resolve the question at issue.[13]

The court first looks to the purposes underlying the right of the United States to redeem real property, on which it has a perfected tax lien, that has been sold to satisfy a lien prior to that of the government. According to the Ninth Circuit:

> Congress intended the redemption statute to prevent foreclosure purchasers from buying real property for less than the fair market value and then selling the real property and keeping the profit. Instead, Congress intended that any excess profit, after all prior liens were satisfied, to inure to the benefit of the taxpayer. Thus, to prevent a potential windfall to a foreclosure purchaser, the IRS can repay the purchaser the purchase price and sell the property at closer to fair market value. All excess profit then accrues for the benefit of the taxpayer—to pay off the taxpayer's liability. The IRS's redemption right protects the taxpayer, who would otherwise be liable to the IRS for unpaid taxes. . . . [14]

This understanding of legislative purpose strongly supports the interpretation propounded by the IRS: that excess expenses, while a necessary element of the redemption price, may be paid after the date of redemption. Otherwise, it would seem that a foreclosure purchaser could invalidate any redemption by simply waiting until 4:59 p.m. of the last day of the 120–day redemption period to claim excess expenses. If the government were unable to process and pay those claims before the close of business on the 120th day, the full redemption amount would not be satisfied within the required period and the redemption would be ineffective. Where a purported redemption is deemed ineffective, the government is conclusively estopped from further pursuing the property.[15] This interpretation clearly contravenes the goal underlying the government's right of redemption: to fully compensate foreclosure purchasers while applying the maximum possible benefit from the property toward the taxpayer's outstanding tax liability. If the purchaser is able to easily confound this purpose by claiming excess expenses at the last minute, the government's redemption right is nominal at best and utterly fails to accomplish its primary purpose.

While only a few decisions address this issue (none of which are binding on this court) two decisions of the Fourth Circuit do provide some support for this analysis. In *Southwest Products Co. v. U.S.*,[16] the Fourth Circuit considered whether the government effectively redeemed property where it tendered a check to the purchaser for the purchase price, plus interest, within the 120–day period, while the check did not include claimed excess expenses.[17] At a foreclosure sale on June 19, 1987, Southwest bid One Million Dollars to purchase property on which the government had properly filed junior tax liens in the amount of $26,618.[18] The trustee allowed Southwest to defer payment on its bid, but required Southwest to pay $90,000 in closing costs.[19] On July 10, 1987, the govern-

---

**13.** *See New Mexico Cattle Growers Ass'n. v. U.S. Fish and Wildlife Service*, 248 F.3d 1277, 1281–82 (10th Cir.2001); *State of Utah v. Babbitt*, 53 F.3d 1145, 1148 (10th Cir.1995).

**14.** *Vardanega*, 170 F.3d at 1186 (citations omitted).

**15.** *See* 26 C.F.R. § 301.7425–4(c)(3).

**16.** *See* 882 F.2d 113 (4th Cir.1989).

**17.** *See id.* at 115–17.

**18.** *See id.* at 115.

**19.** *See id.*

ment contacted Southwest requesting information about Southwest's expenses in connection with the property that would affect the amount the government would have to tender upon redemption.[20] Southwest supplied the requested information eight days before the government's expiration period expired.[21] On October 13, within the redemption period, the government tendered to Southwest a redemption check of $1,020,000; an amount reflecting Southwest's purchase price plus interest, but not including compensation for any of the claimed excess expenses.[22] Southwest refused the tender, asserting that it could not accept the check because it had withdrawn its bid on the property.[23] Nevertheless, the government recorded a certificate of redemption on October 19, 1987, two days after close of the redemption period.[24]

Southwest argued that the government's tender did not effectuate a redemption because Southwest had withdrawn its bid to purchase the property and thus was not the property owner.[25] The Fourth Circuit rejected this argument, explaining that the government's right of redemption is triggered by the sale of the property, not transfer of title.[26] Because the sale was complete upon Southwest's contract to purchase the property, the tendered check was sufficient for redemption.[27] The Fourth Circuit explained that

[W]hen the government tendered the check to Southwest, it stepped into Southwest's shoes as purchaser and acquired [Southwest's] interest. Redemption under § 7425 then was complete, and the government only had to record a certificate of redemption ... to evidence the transaction and to record title to the property in the United States.[28]

Thus, even though the government did not include compensation for Southwest's claimed excess expenses in the redemption check delivered within the 120–day period, the Fourth Circuit held that the check was effective to redeem the property. In arriving at this holding, the court relied in part on a strong policy argument against allowing foreclosure purchasers to thwart the congressional intent behind the United States' right of redemption to satisfy tax liens.[29]

In *Equity Mortgage Co. v. Loftus*,[30] the Fourth Circuit even more directly addressed whether the government's failure to pay excess expenses when tendering a redemption check invalidates the redemption.[31] There, Equity Mortgage held a second deed of trust on property owned by Loftus.[32] The United States held a valid tax lien junior to that held by Equity.[33] Equity foreclosed its second deed of trust and purchased the property for $1,000, subject to the first deed of trust held by Mutual Federal Savings, on which the principal balance was $17,956.[34] Before it

20. *See id.*

21. *See id.*

22. *See Southwest Products Co.*, 882 F.2d at 115–16.

23. *See id.* at 116.

24. *See id.*

25. *See id.*

26. *See id.* at 117.

27. *See id.*

28. *Southwest Products Co.*, 882 F.2d 113 (citation omitted).

29. *See id.* at 117–18.

30. 504 F.2d 1071 (4th Cir.1974).

31. *See id.* at 1073.

32. *See id.*

33. *See id.*

34. *See id.*

foreclosed on the property, Equity made payments to Mutual in the amount of $1,796 to prevent Mutual from foreclosing on its note.[35] Within the 120–day redemption period, the government purported to redeem the property by tendering a check to Equity for $1,019; an amount reflecting Equity's purchase price plus interest, but not including compensation for payments made by Equity to Mutual.[36] Although Equity declined to accept the tender, the government filed a certificate of redemption.[37] Between the date of foreclosure and the date of the tender, Equity paid Mutual an additional $563.[38]

The District Court invalidated the certificate of redemption, in part because the government's tender failed to compensate Equity for the payments it made to Mutual.[39] The Fourth Circuit reversed.[40] The Fourth Circuit explained that although the government must reimburse Equity for the payments to Mutual between the date of foreclosure and the date of tender because they are excess expenses under § 2410(d)(3), "it does not follow that Equity is entitled to a decree quieting title in [the property]."[41] Rather, the court concluded that the proper remedy for the government's good faith failure to tender claimed (and properly payable) excess expenses before expiration of the redemption period was not setting aside the redemption, but granting the government a reasonable period of additional time to perfect its tender.[42] Further, the IRS correctly points out that the *Equity Mortgage* decision predates the amendment of 26 C.F.R. § 301.7425–4 clarifying that excess expenses can be claimed, adjudicated, and

paid beyond the 120–day redemption period.

As in *Equity* and *Southwest*, the IRS's failure to compensate MWT for its claimed excess expenses within the statutory redemption period, without more, does not require this court to invalidate the redemption and quiet title in favor of MWT. Doing so would contradict the language of the redemption statute when taken as a whole, which clearly contemplates claims, adjudication, and payment of excess expenses beyond the 120–day period. Further, such a holding would contradict the legislative purpose underlying the redemption statute by allowing foreclosure purchasers to easily thwart the redemption process and thereby secure a windfall at the expense of the taxpayer and the government. Finally, persuasive authority from the Fourth Circuit indicates that an otherwise effective redemption should be allowed to stand where the government failed to include compensation for claimed excess expenses because it had insufficient time to fully and fairly process the claims before expiration of the redemption period.

The facts of this case indicate that although the IRS had notice of MWT's claimed excess expenses by September 15, 2003, it did not receive requested supporting documentation for those claims until September 25, 2003, just six business days before the redemption period expired. The pleadings indicate that the IRS correctly believed that many of MWT's claimed excess expenses were not properly payable under the terms of the redemption statute. These facts taken into account, it

---

**35.** *See id.*

**36.** *See Equity Mortgage Corp.,* 504 F.2d at 1071.

**37.** *See id.* at 1074.

**38.** *See id.*

**39.** *See id.*

**40.** *See id.* at 1073, 1079

**41.** *Equity Mortgage Corp.,* 504 F.2d at 1077.

**42.** *See id.* at 1078.

was entirely reasonable for the IRS to proceed with the redemption by tendering a check for MWT's purchase price, plus interest, before the redemption period expired; thereby preserving the government's right of redemption and providing sufficient time thereafter to fully and fairly adjudicate and pay MWT's claimed excess expenses.

■ Although MWT does not clearly raise the issue as a disputed question of fact, MWT implies that the IRS acted in bad faith in processing this redemption. Without directly responding to this implication, the IRS explains that it declined to pay MWT for the claimed excess expenses within the redemption period because each of the claimed expenses raised legal issues. Based on its reading of the governing law, as interpreted by the Fourth Circuit, the IRS believed that the claimed excess expenses could be adjudicated and paid after close of the redemption period without compromising the effectiveness of the redemption. This apparent factual dispute has not prevented both parties from moving for summary judgment, inherently asserting that there are no genuine issues as to any material fact. Yet, summary judgment is only appropriate if the court finds that "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." [43] The two-part inquiry is therefore whether this apparent dispute raises a "genuine issue" and whether the disputed fact is "material." "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." [44] Based on the

pleadings, depositions, affidavits, and admissions that have been filed in this case, the court finds no genuine dispute that the IRS acted in good faith. There is simply no evidence upon which a jury could reasonably find that the IRS acted in bad faith. Furthermore, the IRS's good or bad faith is not "material" under the governing law. While the Fourth Circuit in *Equity* found the government's good faith to be a *persuasive* reason for allowing the government time beyond the redemption period to compensate the purchaser for excess expenses, good faith was never enunciated as an outcome-determinative factor. Neither the redemption statutes themselves nor precedent binding on this court indicate otherwise. Because any dispute between the parties over the IRS's good or bad faith presents no genuine issue of material fact, the court finds summary judgment to be appropriate.

The only case cited by MWT directly supporting the proposition that the government loses its right of redemption by failing to include compensation for claimed excess expenses within the 120–day redemption period is both non-binding and clearly distinguishable on its facts. In *Black v. United States*, [45] the U.S. District Court for the Northern District of Alabama considered whether the United States effectively redeemed property where (1) the original foreclosure purchaser bought the property for $33,916 and later sold it to Black for $122,225; [46] (2) the government tendered a check to Black for the original foreclosure purchase price, plus interest, *outside* the 120–day redemption period; [47] and (3) Black refused the tender, but the government nonetheless

---

43.  Fed.R.Civ.P. 56(c).

44.  *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 208 (10th Cir.1997) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

45.  683 F.Supp. 770 (N.D.Ala.1987).

46.  *See id.* at 772.

47.  *See id.*

filed a certificate of redemption and sold the property.[48] In concluding that the government's redemption was ineffective,[49] the court noted that the tender failed to include compensation for excess expenses.[50] However, the court based its decision primarily on the facts that the government failed to exercise its redemption right within the required period[51] and that the government's tender was "so woefully inadequate as to be unconscionable."[52] The court explained that the amount necessary to effectuate a redemption must "leave a party from whom property is being redeemed in no worse a position than that in which he found himself prior to redemption."[53] Under these circumstances, the court concluded that where the United States guessed the redemption amount incorrectly, "even by one penny, and allowed [the redemption period] to expire, it kissed its lien goodbye."[54]

The egregious circumstances responded to in *Black* are clearly not present in the case now before the court. In this case, the government's tender was delivered directly to—and accepted by—the foreclosure purchaser, not an incidental third party. The amount tendered by the government represented the price MWT actually paid to purchase the property, plus interest. Here, the government's tender was plainly intended to restore MWT to the position it occupied before purchasing the property. Although the government's tender did not include compensation for excess expenses claimed by MWT, as the court today explains, those expenses were properly subject to administrative review and payment *after* expiration of the redemption period. In arriving at this hold-

ing, the court relies heavily on the language of 26 C.F.R. § 301.7425–4(b)(3)(ii) allowing purchasers to claim and be compensated for excess expenses beyond the 120–day redemption period. This subsection was amended to its present form in 1995, eight years after *Black* was decided. Thus, the court in *Black* was not applying the same law now governing the court's decision. In sum, the concerns raised in *Black* are simply not applicable to these circumstances and the IRS should be afforded a reasonable time after close of the redemption period in which to fairly compensate MWT for its excess expenses.

## II. Excess Expenses

■ Having decided that the IRS effectively redeemed the property from MWT, the only issue remaining to be decided is whether the IRS fulfilled its statutory obligation to compensate MWT for excess expenses necessarily incurred in connection with the property.

On September 19, 2003, MWT requested compensation from the IRS for the following excess expenses (excluding interest) that it incurred between the date it purchased the property and the date the IRS redeemed the property:

| | |
|---|---|
| Rental Value | $10,200.00 |
| Legal Services | $ 1,500.00 |
| Title Commitment Charges | $ 250.00 |
| Property/Liability Insurance | $ 213.01 |
| Reproduction and Postal Charges | $ 22.00 |
| Total: | $12,185.01 |

MWT re-submitted its claim for excess expenses along with supporting documentation on or about September 25, 2003. The September 25th invoice did not reassert MWT's claim for rental value compensation, but increased MWT's claim for

---

**48.** *See id.* at 772–73.

**49.** *See id.* at 777.

**50.** *See id.* at 775–76.

**51.** *See Black v. U.S.,* 683 F.Supp. at 775.

**52.** *Id.* at 776.

**53.** *Id.*

**54.** *Id.*

professional fees to $2,040.00. On or about May 11, 2003, the IRS issued a check to MWT in the amount of $463.01—compensating MWT for title commitment charges and property/liability insurance. The IRS denied MWT's request for excess expenses for rental value, legal services, and reproduction and postal charges.

By failing to pursue its initial claim for rental value, MWT has presumably conceded that this claim is not properly payable. If MWT has not conceded this point, the IRS is entitled to summary judgment that such expenses are not properly payable. Title 26 C.F.R. § 301.7425–4(b)(1)(iii) provides that the purchaser is entitled to compensation for "expenses necessarily incurred to maintain [the] property." Subsection 301.7425–4(b)(3) explains that such expenses

> [I]nclude, for example, rental agent commissions, repair and maintenance expenses, utilities expenses, legal fees incurred after the foreclosure sale and prior to redemption in defending the title acquired through the foreclosure sale, and a proportionate amount of casualty insurance premiums and ad valorem taxes.

This provision clearly addresses expenses incurred by the purchaser while awaiting redemption by the government. Rental value is not such an expense. The redemption statutes simply do not require the government to compensate the purchaser for the rental value of the property between the date of purchase and the date of redemption. Thus, the IRS properly refused MWT's request for rental value compensation.

■ MWT claimed compensation for reproduction and postal charges presumably incurred in connection with the purchase or redemption process. MWT failed to provide any documentation of this expense

and has not contradicted the assertion of the IRS that such expenses are not properly payable. The IRS is entitled to summary judgment on the issue of postage and reproduction expenses.

■ The parties' remaining dispute concerning excess expenses focuses solely on legal expenses incurred by MWT (after the date of purchase and before the date of redemption) in the amount of $2,040.00. MWT explains that these legal expenses were incurred in the course of defending the property from waste by the prior owner, who was in possession of the property and was using it to the detriment of MWT's ownership interest. To this end, MWT was forced to commence an eviction action against the unlawful occupant. The IRS argues that because MWT's legal expenses were not related to an action for quiet title, they were not within the scope of the legal expenses contemplated by the redemption statutes. The court disagrees.

As noted earlier, 26 C.F.R. § 301.7425–4(b)(1)(iii) provides that the purchaser is entitled to compensation for "expenses necessarily incurred to maintain [the] property." Subsection 301.7425–4(b)(3) explains that such expenses "include, *for example,* . . . legal fees incurred after the foreclosure sale and prior to the redemption in defending the title acquired through the foreclosure sale." [55] The language of this subsection clearly intends to provide the court guidance in applying the 'necessary expenses' clause, without strictly limiting the court to only those examples specified. Thus, excess expenses may include legal fees incurred during the redemption period other than those incurred in defending the title, if the court finds that such expenses were necessary to maintain the property.

**55.** (Emphasis added).

Under Utah law, an action for quiet title "may be brought by any person against another who claims an ... interest in real property ... adverse to him, for the purpose of determining such adverse claim."[56] However, Utah law also provides two mechanisms through which a landowner can remove someone unlawfully occupying the landowner's property. Under Utah's Forcible Entry and Detainer Act,[57] a landlord may, upon proper notice, evict a tenant who unlawfully holds or keeps possession of the landlord's property.[58] Similarly, Utah has preserved the common law action of ejectment, whereby a landowner can recover possession of leased premises from a tenant in breach where it is stipulated in the lease that the lessor has a right to reenter.[59] It is well established that landowners have the choice to pursue the most appropriate remedy for the unlawful occupation of the landowner's property by a tenant, whether that remedy hails in quiet title, unlawful detainer or ejectment.[60] Surely, this determination depends in large part on whether the unlawful occupant claims an adverse interest in the property. If not, then an action for quiet title would be inapplicable and the appropriate remedy would be either an action for unlawful detainer or ejectment. Where a landowner's interest in his property is threatened by an unlawful occupant, he has a right to protect that interest through legal action, just as he does to protect his ownership interest from adverse claims.

In this case, the undisputed evidence before the court indicates that MWT sought to protect its ownership interest in the property from harm or waste inflicted by the unlawful occupation of the prior owner. Apparently, in MWT's judgment, an action for quiet title was inappropriate under the circumstances; rather, the appropriate response to the unlawful occupation was eviction proceedings. The court finds that these eviction proceedings were as necessary to maintain the property from harm or waste during the redemption period as would be an action for quiet title.

Further, the redemption provision for excess expenses demonstrates "an intent that the government leave a party from whom property is being redeemed in no worse a position than that in which he found himself prior to redemption."[61] The evidence before the court indicates that MWT incurred its claimed legal expenses during the months of July and August; substantially before MWT received notice that the IRS was *considering* exercising its right of redemption. Without knowing that the IRS would exercise its right to redeem the property in September, MWT incurred its claimed legal expenses in the good faith operation of its real estate business. MWT acted just as any new property owner would act where a prior owner unlawfully refused to leave the premises.

In light of the court's finding that MWT's legal action was necessary to maintain the property, and the purpose of the excess expenses provision to return the purchaser to no worse a position than he occupied before the redemption, the court

56. U.C.A. § 78-40-1 (2002).

57. *See* U.C.A. § 78-36-1, *et seq.* (2002).

58. *See* U.C.A. §§ 78-36-2 & 3.

59. *See Cache County v. Beus*, 978 P.2d 1043, 1046-47 (Utah Ct.App.1999); *Hackford v. Snow*, 657 P.2d 1271, 1275 n. 5 (Utah 1982).

60. *See Robinson v. Thomas*, 75 Utah 446, 286 P. 625, 628 (1930) (citing *Gibson v. McGurrin*, 37 Utah 158, 106 P. 669 (1910)).

61. *Black v. U.S.*, 683 F.Supp. at 776.

concludes that the IRS must compensate MWT for its claimed legal expenses.

## CONCLUSION

The court finds summary judgment is appropriate in this case because there are no genuine issues as to any material facts. On the effectiveness of the redemption, the court holds that the IRS is entitled to judgment as a matter of law. The court finds that the IRS effectively redeemed the property from MWT. Accordingly, it is ordered that title in the subject property is quieted in favor of the IRS. Everson's motion for summary judgment [13–1] is hereby GRANTED. MWT's motion for summary judgment on this issue is DE-NIED in part and GRANTED in part[18–1]. The court finds that the IRS errone-ously declined to compensate MWT for its claimed legal expenses incurred in connec-tion with the property. The IRS is there-fore ordered to compensate MWT for legal expenses in the amount of $2,040.00 within a reasonable period of time. The clerk's office is directed to close the case.